# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHAEL LIPFORD,

        Plaintiff,

        v.

CITY OF CHICAGO, et al.,

        Defendants.

Case No. 15-cv-6988

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Lipford and Defendants Guy Dailey, Leif Goff, and Bernard Veleta proceeded to a jury trial on Plaintiff's claims that Defendants violated his constitutional rights when they entered and searched his apartment, arrested him, and seized three firearms and $850 in September 2013. At the close of all evidence, Defendants orally moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). This Court heard oral arguments from both sides. For the reasons stated in open court on June 12, 2018, and explained more fully below, this Court partially granted and partially denied Defendants' motion.

## I.    Legal Standard

After a party presents all of its evidence on an issue during a jury trial, the court may grant judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The court must assess the evidence as a whole, drawing all reasonable inferences in favor of the non-moving party. *Hall v. Forest River, Inc.*, 536 F.3d 615,

619 (7th Cir. 2008). The court may not make credibility determinations or weigh evidence. *Whitehead v. Bond*, 680 F.3d 919, 925–26 (7th Cir. 2012).

## II. Analysis

The evidence at trial consisted of testimony from all four parties, a testimonial stipulation from an employee with the Federal Bureau of Investigation, a factual stipulation that Defendants acted under color of law, and the following exhibits (all admitted without objection): multiple photos of Plaintiff's apartment taken after the incident, a state court order for the return of Plaintiff's firearms, Plaintiff's arrest report, Plaintiff's criminal case incident report, and a Chicago Police Department (CPD) property turnover sheet for Plaintiff's firearms.

### A. Searches of Plaintiff's Safes

Plaintiff kept two safes in his room—a big safe and a small safe—that he claimed Defendants searched in violation of his Fourth Amendment rights. The Fourth Amendment prohibits "unreasonable searches and seizures." Warrantless searches presumptively violate the Fourth Amendment, s*ee Kyllo v. United States*, 533 U.S. 27, 31 (2001), but a person's voluntary consent to a search of his property generally renders a warrantless search reasonable, *see United States v. Wright*, 838 F.3d 880, 884 (7th Cir. 2016).

As to the big safe, Plaintiff testified that he opened the safe only because Defendants pressured him, including by threatening that he would go to jail if he did not open it. In contrast, Defendants testified that they did not pressure Plaintiff and that he opened the safe of his own accord to search for his FOID card.

As to the small safe, Plaintiff testified that Defendants removed him from his bedroom at some point to hold him in the living room, and that the small safe remained intact then. When Plaintiff returned to his apartment after spending a few days in jail, he saw that someone had opened the small safe with a crowbar. Plaintiff's arrest report, which Goff wrote, describes the contents of Plaintiff's big safe and then states that "A/O's [sic] gained entry to another safe." The arrest report's opening line reads: "In summary A/O's [sic] while conducting a probation check with Cook County Probation Officers did a check" at Plaintiff's apartment.

Defendants testified that "A/Os" means "arresting officers," and Veleta demonstrated that the arrest report lists eight "Assisting Arresting Officers," including the probation officers who accompanied Defendants to Plaintiff's apartment. During their testimony, Defendants all denied opening the small safe and suggested that probation officers opened it.

Considering all of the evidence regarding these searches and drawing all reasonable inferences in Plaintiff's favor, *Hall*, 536 F.3d at 619, a reasonable jury could have found for Plaintiff on both searches by crediting Plaintiff's testimony and drawing certain inferences in Plaintiff's favor,[1] *see Wright*, 838 F.3d at 884. The record contained no evidence of search warrants, and under Plaintiff's version of events, he did not voluntarily consent to opening either safe. Although Plaintiff did not see who opened the small safe, a reasonable jury could have inferred from the arrest report's opening line—which distinguished between A/Os and Cook County probation officers (CCP)—that the later reference to A/Os gaining entry to the small

---

[1] Indeed, the jury later found for Plaintiff against all Defendants as to the searches of both safes.

safe meant that Defendants opened it. Thus, factual issues remained for the jury, and this Court denied Defendants' motion as to the searches of the safes.

**B.    Seizure of $850**

Plaintiff also claimed that he had $850 in cash that Defendants stole in violation of his Fourth Amendment rights. Absent consent or another recognized exception to the warrant requirement, warrantless seizures of property violate the Fourth Amendment. *See United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009) (citing *United States v. Place*, 462 U.S. 696, 701 (1983)). Under that standard, police officers would plainly violate the Fourth Amendment if they stole money from someone's home while acting under color of law. *See id.*

Plaintiff testified that he kept $850 in cash in a red pouch inside the big safe. He also testified that Goff told him to put the pouch on top of the safe at some point. When Plaintiff returned to his apartment after several days in jail, he realized that someone had taken the pouch. Plaintiff did not see anyone take the money, but he testified that Defendants spent more time investigating his bedroom with CCP after they removed him from the room. Defendants testified that they never saw a red pouch or any loose cash in the big safe.

Considering all of the evidence regarding the money and drawing all reasonable inferences in Plaintiff's favor, *Hall*, 536 F.3d at 619, a reasonable jury could have found for Plaintiff on his money-seizure claim, *see James*, 571 F.3d at 713. Although Plaintiff's evidence regarding Defendants' personal involvement in any theft was—to say the least—not compelling, Defendants' counsel conceded that

the parties' conflicting stories about the money created a question of fact for the jury.[2] Thus, this Court denied Defendants' motion as to the seizure of the $850.

## C.    Entry into Plaintiff's Apartment

Plaintiff claimed that Defendants violated his Fourth Amendment rights when they entered his apartment with CCP to look for his roommate, Deandre Norfleet, a probationer.  In seeking a directed verdict, Defendants invoked qualified immunity for Plaintiff's unlawful entry claim.[3]

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, qualified immunity protects officers who make "mere mistakes" of law, fact, or a mix of the two. *Id.*

When a defendant invokes qualified immunity, the burden shifts to the plaintiff to show two things: (1) that the defendant violated a statutory or constitutional right; and (2) that the right was "clearly established" at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  A court may address the prongs in whichever order it prefers. *Pearson*, 555 U.S. at 236. The defendant merits qualified immunity if the plaintiff fails to meet his burden on either prong. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017).

---

[2] The jury later found for Defendants on the money-seizure claim.

[3] Defendants actually invoked qualified immunity for all of Plaintiff's claims, but given Plaintiff's version of events for the previous claims, this Court did not need to reach the qualified-immunity analysis for those claims

"Clearly established" means that existing precedent "placed the statutory or constitutional question beyond debate" at the time of the alleged violation. *Id.* Plaintiff must show that "every reasonable official would understand" that his actions violated a given right. *Id.* Crucially, a plaintiff cannot succeed by identifying clearly established law "at a high level of generality" not "particularized" to the facts of his case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Particularity becomes even more significant in the Fourth Amendment context, where the Supreme Court has recognized that officers often struggle "to determine how the relevant legal doctrine" applies to "the factual situation" they confront. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

At summary judgment, Defendants did not invoke qualified immunity for the entry. *See* [106] at 5–6 (Defendants merely hinted that Norfleet's status as a probationer gave Plaintiff limited grounds to challenge the entry). Moreover, at the summary judgment stage, neither side provided evidence of the conditions of Norfleet's probation—such as whether probation officers could search his home at any time with reasonable suspicion—or of Plaintiff's knowledge of Norfleet's probation conditions. *Id.*

At trial, however, such evidence came out and altered the landscape considerably, because under the law (certainly as it existed in September 2013), a probationer has a reduced expectation of privacy and remains subject to warrantless searches of his home if reasonable suspicion exists that he has engaged in criminal activity. *See United States v. Knights*, 534 U.S. 112, 121 (2001).

Plaintiff testified to the following things at trial regarding Norfleet:

- Plaintiff knew that Norfleet was on felony probation.

- Before the incident involving Defendants, CCP came to the apartment to inspect it, and they interviewed Plaintiff. During that interview, they told Plaintiff about certain rules, including that Norfleet had a curfew and could not be around guns.

- From that same interview, Plaintiff knew that Norfleet's probation agreement required Norfleet to submit to searches of his person or residence whenever CCP had reasonable suspicion to justify a search.

- Plaintiff understood that Norfleet had to be home by 7 p.m. each day.

- Despite the curfew requirement, Norfleet often spent nights at his girlfriend's home, which—to use Plaintiff's phrasing—got Norfleet into some trouble.

- Before the incident, three to four probation officers came to the apartment almost every other day to check on Norfleet. Plaintiff was used to the officers coming into his apartment.

Defendants all testified that, on the night in question, their assignment involved accompanying CCP to provide security and make arrests if necessary. Dailey explained that Defendants' shift started at 6 p.m. that day, and that they visited several other probationers before going to Plaintiff's apartment after curfew. Goff said that Defendants knew that the purpose of visiting Plaintiff's apartment was for CCP to do a "spot check" on Norfleet.

Defendants all testified that they visited Plaintiff's apartment twice that night. On the first visit, Defendants said they did not enter the apartment; someone answered the door and told CCP that Norfleet was not home. According to Defendants, they then accompanied probation to Norfleet's girlfriend's home, but did not find Norfleet there. Defendants testified that they returned to Plaintiff's

apartment with CCP later in the evening.

Defendants all testified that, when they arrived at Plaintiff's building for the second time, they stood in a vestibule at the bottom of a short flight of stairs while CCP spoke to the person who answered Plaintiff's door. Defendants testified that they could neither see the person at the door nor hear the person's conversation with CCP. Plaintiff testified that he was in his room watching TV when officers arrived, and that another person in the apartment—Quincy Harris, a friend of Norfleet's—came to Plaintiff's room to tell him that officers were at the door. Plaintiff said he went to the door after Harris alerted him to the officers' presence, but he offered conflicting testimony on whether he or Harris opened the door to the officers. Regardless, Plaintiff's account indicated that someone opened the door and CCP told Plaintiff that they wanted to see Norfleet. Defendants testified that they followed CCP into the apartment after the conversation at the door concluded. Plaintiff testified that Norfleet was not home when Defendants entered the apartment, but Norfleet later returned to the apartment after police arrived.

Contrary to Defendants' account, Plaintiff testified that Defendants came to his apartment only once on the night in question. He said that Defendants arrived around 7 p.m., but he later clarified by testifying that he did not get home that night until *after* 7 or 8 p.m. Moreover, Plaintiff testified that Defendants arrested him around 9 p.m.,[4] and the evidence (and Defendants' uncontroverted testimony) established that Defendants spent—at most—30 minutes inside Plaintiff's home before arresting him. Thus, Plaintiff would not have had personal knowledge of

---

[4] Plaintiff's arrest report lists the time of arrest as 9:40 p.m.

Defendants' first visit.

Even crediting Plaintiff's testimony that Defendants only visited his apartment once, however, Defendants still had reasonable suspicion that Norfleet violated his curfew. Reasonable suspicion means something "more than a hunch"; it exists when officers have "some objective manifestation" of criminal activity. *Knox v. Smith*, 342 F.3d 651, 659 (7th Cir. 2003) (internal quotation marks omitted); *see also Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less" than probable cause) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Under Plaintiff's version of events, Defendants came to his apartment, at the earliest just after 7 p.m., and possibly as late as 8:30 p.m. Either way, they arrived *after* Norfleet should have come home to comply with his probation-imposed curfew. But when CCP knocked on the door—for a regular spot check that Plaintiff said occurred nearly every two days—Norfleet did not come to the door. Instead, Plaintiff or Harris answered the door, and neither Plaintiff nor Harris gave CCP any indication that Norfleet was home.

Norfleet's failure to come to the door for a regular spot check, combined with Plaintiff and Harris' failure to give CCP any assurances that Norfleet was home, gave CCP "more than a hunch" that Norfleet had engaged in criminal activity by violating his curfew. *See Knox*, 342 F.3d at 659. Defendants offered uncontroverted testimony that CCP told them that Norfleet violated his curfew. The collective knowledge doctrine imputes CCP's knowledge of the circumstances creating

reasonable suspicion to Defendants, regardless of whether Defendants themselves had "firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 253 (7th Cir. 2010); *see also United States v. Parra,* 402 F.3d 752, 764 (7th Cir. 2005) (explaining that law enforcement cannot work effectively unless "officers can act on directions and information transmitted by one officer to another," and officers do not need "to cross-examine their fellow officers about the foundation for the transmitted information") (quoting *United States v. Hensley*, 469 U.S. 221, 231 (1985)).

As this Court stated above, officers may search a probationer's home without a warrant when they have reasonable suspicion that the probationer engaged in criminal activity. *See Knights*, 534 U.S. at 121. But the law remains unsettled (and thus could not have been settled in 2013) on the question of exactly how living with a probationer affects a non-probationer's expectation of privacy; some courts have found a reduced expectation of privacy for people who know about their roommate's probation conditions. *Compare Thornton v. Lund*, 538 F. Supp. 2d 1053, 1058 (E.D. Wis. 2008) (concluding that "the reasoning underlying the Supreme Court's view that parolees and probationers have a diminished privacy interest appears not to apply to individuals with whom they live"), *and Barajas v. City of Rohnert Park*, 159 F. Supp. 3d 1016, 1026 (N.D. Cal. 2016) (explaining that a probationer's co-resident who "has *no knowledge* of the [probation] search condition applicable to their home" can refuse a search, but granting qualified immunity to the defendant officer) (emphasis added), *with Taylor v. Brontoli*, No. 1:04-cv-0487, 2007 WL 1359713, at

*1 n.4 (N.D.N.Y. May 8, 2007) (finding that a co-resident's refusal of a search did not control when the co-resident "knew that Malloy was on probation and that her trailer was subject to searches"). Like the *Taylor* plaintiff, Plaintiff knew many details about Norfleet's probation, including that Norfleet had to submit to searches of his residence when CCP had reasonable suspicion of criminal activity.

Given the unsettled state of the law on this issue, Plaintiff could not show that his right to be free from entries to his home based upon reasonable suspicion of a probation violation by his roommate—if such a right exists—was clearly established in September 2013. Indeed, in response to Defendants invoking qualified immunity during oral argument, Plaintiff's counsel argued only that police generally need probable cause to enter a person's home without a warrant. That proposition holds true in the abstract, but it lacks any connection to the facts of this case and thus did not help Plaintiff. *See White*, 137 S. Ct. at 552 (a plaintiff cannot defeat qualified immunity by defining clearly established law "at a high level of generality"). Plaintiff's failure to meet his burden on the second prong of the qualified-immunity analysis entitled Defendants to qualified immunity. *See Green*, 868 F.3d at 633. Thus, this Court granted Defendants' motion as to the alleged unlawful entry claim.

## D. Protective Sweep of Plaintiff's Home

Plaintiff also claimed that Defendants violated his Fourth Amendment rights by looking into the open door of his bedroom immediately after they entered his home. As stated in open court and explained further below, Defendants did not

actually search Plaintiff's bedroom (setting aside the safes). Rather, they conducted a legitimate protective sweep looking for Norfleet during which they observed guns in plain sight.

Plaintiff acknowledged that he did not close the door to his room when he left it after Harris told him that officers were at the apartment door. Dailey and Veleta testified that, after entering Plaintiff's apartment, they immediately walked to the end of the hallway to look for Norfleet or other occupants and inform them of the police presence in the apartment. Both officers testified that, when they reached the end of the hallway, they looked through the open door into Plaintiff's room and saw a shotgun sitting on a shelf above the bed. They estimated that it took less than 30 seconds from the time they entered the apartment to reach the threshold of Plaintiff's bedroom. After seeing the shotgun, Dailey and Veleta alerted Goff and CCP about the gun and entered the room to secure the weapon—in other words, to make sure the gun did not contain any ammunition and could not be used against them. Veleta testified that, after entering Plaintiff's bedroom, he saw another shotgun in plain view leaning against the wall and secured that gun as well.

Although protective sweeps often occur incident to an arrest, the rationale behind a protective sweep "remains the same regardless of how the officers arrived in the home," as long as they arrived lawfully. *United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013). The court must assess whether an officer had "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in

believing that the area swept harbored an individual posing a danger to the officer or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990) (citations omitted). The court must conduct this fact-specific inquiry in the context of *Buie's* "overarching policy concerns"—that officers have the right to ensure their safety, and the safety of bystanders, when they lawfully enter someone's home. *Leaf v. Shelnutt*, 400 F.3d 1070, 1087 (7th Cir. 2005).

Plaintiff's testimony established that his apartment has multiple bedrooms, and that his room lies past Norfleet's room at the end of a hallway, meaning Norfleet's room is closer to the apartment door. By the time Defendants walked through the apartment door, they had already encountered two people. Given the number of people clustered near the door, Defendants rationally could have inferred that more people might be present elsewhere in the apartment. And "the configuration of the dwelling" meant that Defendants would have left themselves and CCP vulnerable if they confined themselves to Norfleet's room and did not walk a few more feet down the hallway to see if Plaintiff's room held any other people. *See United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014). Finally, the sweep lasted no longer than necessary to fulfill its legitimate purpose; Dailey and Veleta's uncontroverted testimony indicated that it took no more than 30 seconds to walk to Plaintiff's room from the time they entered the apartment, and after seeing weapons in plain view, they quickly went through the already open door to secure the weapons. *See United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir. 1995) (approving a protective sweep that "took no more than five minutes, an interval

compatible with the officers' legitimate purpose").

Hence, Defendants were lawfully (or at least arguably lawfully, given qualified immunity) present in Plaintiff's apartment and they conducted a lawful protective sweep to look for Norfleet and ensure their own safety. *See Leaf*, 400 F.3d at 1087. During that lawful sweep, Dailey and Veleta saw a gun in plain sight through Plaintiff's open bedroom door and reasonably entered the room to secure the gun, thereby protecting themselves and the apartment's other occupants from unexpected gunfire. Plaintiff's counsel conceded during oral argument that if Defendants were lawfully present at the end of the hallway where they could look through Plaintiff's open door, seeing the gun would not have constituted a search. Thus, this Court granted Defendants' motion as to the protective sweep.

### E.    Plaintiff's Arrest

This Court granted summary judgment to Defendants on Plaintiff's false-arrest claim because Plaintiff argued only that Defendants lacked probable cause for the arrest, despite evidence proving that Defendants undoubtedly had probable cause to arrest Plaintiff for violating the Illinois FOID Card Act. [106] at 6–8. Simply put, Plaintiff argued at summary judgment as if he had only an Illinois tort claim for false arrest, and failed to argue any Fourth Amendment claim for an unconstitutional seizure. *See generally* [92]. That said, after reviewing Plaintiff's second amended complaint [45], which generally alleges Count I as "4th Amendment as to Individual Defendants," and the evidence at trial, this Court recognized that Plaintiff might also have a surviving Fourth Amendment claim for a

warrantless in-home arrest (although Plaintiff and Defendants failed to argue that claim at summary judgment).[5]  *See Hawkins v. Mitchell*, 756 F.3d 983, 991 (7th Cir. 2014) (distinguishing between a claim for a false arrest under state law and a claim for an unconstitutional seizure under the Fourth Amendment).  Here, this Court reviews its probable-cause determination from the summary judgment stage before discussing the constitutional facet of Plaintiff's arrest claim.

### 1.    Probable Cause

At summary judgment, Plaintiff claimed that Defendants falsely arrested him because they lacked probable cause to ask if he had a FOID card, and still lacked probable cause after asking for the card because he "gave every indication of believing that he had a FOID card." [92] at 9–10.  Defendants successfully argued that they did not need probable cause to ask for the FOID card and that Plaintiff's failure to produce the card gave them probable cause to arrest him. [99] at 7–9.

Probable cause provides an absolute defense to a false arrest claim.  *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009).  Probable cause for an arrest exists when the facts and circumstances at the time of the arrest—viewed from the perspective of a reasonable person in the officer's shoes—warrant a prudent person believing that the suspect committed, is committing, or will commit a crime.  *Id.*  If reasonable minds could differ over the facts or resulting inferences, the probable cause determination belongs to the jury.  *Id.*

According to the plain language of the FOID Card Act, no person "may

---

[5] This Court asked if Plaintiff wanted a mistrial or continuance based upon this aspect of the original summary judgment ruling, and Plaintiff said no to both.

acquire or possess any firearm" or firearm ammunition "without having *in his or her possession* a Firearm Owner's Identification Card." 430 ILCS 65/2(a) (emphasis added). Likewise, Illinois courts interpret the statute as criminalizing the mere failure to possess a physical FOID card if one also possesses a gun or ammunition. *See People v. Mourecek*, 566 N.E.2d 841, 845 (Ill. App. Ct. 1991) ("A person commits the offense of failing to possess a State FOID card when he possesses a firearm or firearm ammunition without having a FOID card in his *immediate* possession.") (emphasis added). Thus, contrary to Plaintiff's counsel's line of questioning at trial—and line of argument at summary judgment—Defendants did not need to check any database to determine whether Plaintiff lacked a valid FOID card before arresting him. They developed probable cause for a violation of § 65/2(a) as soon as Plaintiff admitted that he could not produce a physical FOID card. *See id.*

Contrary to Plaintiff's interpretation at summary judgment, [92] at 5, the FOID Card Act has no knowledge or intent requirements. *See People v. Schweihs*, 43 N.E.3d 979, 982 (Ill. 2015). In *Schweihs*, the Illinois Supreme Court compared the FOID Card Act with the offense of aggravated unlawful use of a weapon (Agg-UUW); proving Agg-UUW requires showing that someone "knowingly" carried a firearm outside the home "without having been issued a valid FOID card." *Id.* In contrast, "to prove a violation of the FOID Card Act, the State need only prove possession of a firearm without a FOID card." *Id.*

And no case supports Plaintiff's position at summary judgment that Defendants needed probable cause to believe that he violated the FOID Card Act

16

*before* they could ask to see his FOID card. Logically, such a requirement would make it nearly impossible to develop probable cause for a violation of the FOID Card Act, unless gun owners regularly announce that they lack FOID cards. And the cases that Plaintiff cited for his dubious argument addressed whether officers had the reasonable suspicion necessary for a *Terry* stop of a moving vehicle, not whether officers already lawfully conversing with someone may ask to see a FOID card. *See, e.g., People v. Granados*, 773 N.E.2d 1272, 1276 (Ill. App. Ct. 2002).

Finally, this Court notes that Plaintiff blurs the fundamental difference between probable cause to arrest and guilt beyond a reasonable doubt. During a discussion outside the presence of the jury, Plaintiff's counsel argued that the fact that a jury found Plaintiff not guilty at his criminal trial meant that Defendants must have lacked probable cause to arrest Plaintiff. That argument presents a false dichotomy. Plainly, a finding of guilt "beyond a reasonable doubt" requires a higher and different standard of proof than probable cause. *See Brinegar v. United States*, 338 U.S. 160, 175 (1949) (probable cause "means less than evidence which would justify condemnation or conviction"); *Draper v. United States*, 358 U.S. 307, 311–12 (1959) (petitioner "goes much too far in confusing and disregarding the difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest"). Logically, it does not follow that officers lacked probable cause to arrest if a jury later finds the arrestee not guilty in a criminal trial. *See Harney v. City of Chicago*, 702 F.3d 916, 924 (7th Cir. 2012) ("the fact that the state trial judge decided the videotape evidence was insufficient to find either

Harney or Midona guilty beyond a reasonable doubt does not undercut the finding of probable cause for the arrest"); *Scruggs v. United States*, 929 F.2d 305, 307 (7th Cir. 1991) ("Acquittal does not establish the lack of probable cause.").

Defendants unquestionably possessed probable cause to believe that Plaintiff violated the FOID Card Act when he admitted to possessing the firearms and ammunition in his bedroom and admitted that he could not produce a FOID card. *See Mourecek*, 566 N.E.2d at 845. Thus, this Court granted summary judgment to Defendants on Plaintiff's false arrest claim.

### 2. Warrantless In-Home Arrest

Although Plaintiff failed to argue his wrongful arrest claim at summary judgment based upon a "warrantless in-home arrest" theory under the Fourth Amendment, he nonetheless made it to trial with that theory intact since Defendants also failed to argue it at summary judgment. That specific claim, however, did not progress beyond the close of the evidence.

A warrantless in-home arrest presumptively violates the Fourth Amendment even if officers have probable cause to arrest. *See Hawkins*, 756 F.3d at 992 (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). But that presumption flows from the principle that the Fourth Amendment does not allow police to make an otherwise valid arrest inside a home if they first make an *unlawful* entry into the home. *See Payton*, 445 U.S. at 576 (holding that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest"). By contrast, Defendants here

entered Plaintiff's home in a manner that was at least arguably lawful under the qualified-immunity standard, so *Payton's* rationale does not apply to the facts of this case.

Because Defendants merited qualified immunity for the entry, they likewise merited qualified immunity for the warrantless in-home arrest. *See White v. Stanley*, 745 F.3d 237, 242 (7th Cir. 2014) (granting qualified immunity to officers who entered a man's home without a warrant after smelling marijuana and arrested him, because not every reasonable official would have understood that entering the home under those circumstances violated the man's rights). Since Defendants could have reasonably believed that they lawfully entered the apartment based upon reasonable suspicion to arrest Norfleet, they could have also reasonably believed that they could effectuate an in-home, warrantless arrest of Plaintiff based upon probable cause.

Plaintiff failed to meet his burden to show any clearly established right to be free from such an arrest made by officers who were at least arguably lawfully present in the home. Thus, this Court granted Defendants' motion as to Plaintiff's warrantless in-home arrest. *See Green*, 868 F.3d at 633 (qualified immunity protects a defendant when the plaintiff fails to meet his burden of proof on either prong of the qualified-immunity analysis).

## F.    Seizure of Firearms

A similar cascading qualified-immunity analysis also protected Defendants from civil liability on Plaintiff's final claim: that Defendants violated his Fourth

Amendment rights by seizing his shotguns after they arrested him for violating the FOID Card Act. Defendants testified that they seized the guns after arresting Plaintiff and inventoried the guns as evidence of Plaintiff's crime.

During oral argument on the Rule 50(a) motion, Plaintiff's counsel conceded that Defendants could lawfully seize Plaintiff's firearms as instrumentalities of Plaintiff's alleged crime, assuming Defendants made an arrest based upon probable cause and did not otherwise violate Plaintiff's Fourth Amendment rights by arresting him in his home without a warrant. That concession aligns with the general principle that police may lawfully seize property in plain view—even without a warrant—if they have probable cause "to associate the property with criminal activity." *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 69 (1992). According to the uncontroverted portions of the evidence, Plaintiff's two shotguns were in plain view in his bedroom, and Defendants had lawful access to those guns as part of their protective sweep. Moreover, Plaintiff admitted to Defendants that he owned the firearms and that he could not produce a FOID card, so Defendants had probable cause "to associate the property with criminal activity"—namely, possessing firearms without possessing a FOID card. *See id*; *see also Horton v. California*, 496 U.S. 128, 136–37 (1990). Under those facts, Defendants reasonably seized Plaintiff's shotguns, or, at the very least, merited qualified immunity. Plaintiff offered no argument to the contrary.

Plaintiff's testimony also revealed, however, that his third firearm, a pistol, was in the small safe and not in plain sight when Defendants entered the

apartment.  As noted above, a reasonable jury could have found that Defendants violated Plaintiff's Fourth Amendment rights by searching the small safe and finding the pistol.  Analyzing Plaintiff's claim for an unconstitutional seizure of the pistol thus would have required a different analysis than the shotguns, but neither Plaintiff nor Defendants addressed the seizure of the pistol during oral argument on the motion (or later in the jury instruction conference).  Accordingly, this Court did not specifically address the seizure of the pistol in either its oral ruling on Defendants' motion or in the final set of jury instructions.  *See Williams v. Dieball*, 724 F.3d 957, 963 (7th Cir. 2013) ("It is not the district court's job to flesh out every single argument not clearly made.").  As such, Plaintiff did not preserve any potential error on the pistol seizure claim because he failed to present that argument, "even though the issue may have been before the district court in more general terms"; in any event, he also expressly waived the claim later at the July 11, 2018 status hearing.  *See id.* at 961 (quoting *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010)).

Finally, this Court notes that Defendants' uncontroverted evidence indicated that they ceased to have any role in keeping Plaintiff's firearms beyond September 2014, when Goff transferred the guns to an Assistant Cook County State's Attorney at the start of Plaintiff's criminal trial.  After that point, the State's Attorney's Office (SAO) held Plaintiff's firearms through the start of his civil trial before this Court.  Defendants cannot be liable for the SAO failing to return Plaintiff's firearms, nor can they be liable for the bad advice that Plaintiff testified to receiving

from his public defender about where to seek the return of his firearms, or for the incorrect information about the firearms being destroyed that Plaintiff testified to receiving from an unidentified person working at CPD's Evidence and Recovered Property Section (ERPS) at Homan Square. Section 1983 requires personal involvement in the alleged constitutional deprivation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). For the reasons described above (and ultimately, for Plaintiff's failure to carry his burden to defeat qualified immunity), this Court granted Defendants' motion as to the seizure of Plaintiff's shotguns.

## III.    Conclusion

For the reasons stated on the record on June 12, 2018, and explained more fully here, this Court partially granted and partially denied Defendants' motion for judgment as a matter of law under Rule 50(a). This Court granted the motion as to Plaintiff's claims for an unconstitutional entry, an unconstitutional search of the apartment, an unconstitutional in-home arrest, and an unconstitutional seizure of his shotguns on grounds of qualified immunity. This Court denied the motion as to Plaintiff's claims for unreasonable searches of his safes and an unreasonable seizure of $850, and Plaintiff ultimately waived any claim regarding an unconstitutional seizure of his pistol. The parties have also advised that they do not intend to file any post-trial motions.

Based upon the settlement [140] and [141], the parties have stipulated to Plaintiff's attorneys' fees and costs pursuant to a release and satisfaction of judgment, and this Court hereby approves and enters a judgment of attorneys' fees

and costs of Plaintiff's counsel under 42 U.S.C. § 1988, Rule 54(d), and 28 U.S.C. § 1920, in the amount of $40,000 to be paid by the City of Chicago as indemnitor under 745 ILCS 10/9-102.

Enter Judgment upon the jury verdict. Civil case terminated.

Dated: July 19, 2018

Entered:

John Robert Blakey
United States District Judge